# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Action No. 06-26 |
| | ) | |
| v. | ) | |
| | ) | Honorable Arthur J. Schwab |
| CYRIL H. WECHT | ) | |
| | ) | |
| | ) | **ELECTRONICALLY FILED** |

## MOTION FOR A SUPPRESSION HEARING
## AND TO SUPPRESS ALL EVIDENCE GAINED BY THE
## GOVERNMENT AS A RESULT OF ILLEGAL SEARCHES

NOW COMES Defendant, by and through his undersigned counsel, pursuant to

Fed.R.Crim.Pro. 12(b)(3)(C) and 41(h), to respectfully move the Court for: (1) a suppression

hearing regarding certain searches carried out by the Government following its targeting of Dr.

Cyril Wecht; (2) the suppression of all evidence obtained as a result of the illegal searches; and

(3) dismissal of all counts of the indictment derived from illegally obtained evidence.[1]

## I.   INTRODUCTION

"[A] loose interpretation of the mail fraud statute creates 'a

catch-all political crime which has no use but misuse.'"

United States v. Murphy, 323 F.3d 102, 118 (3d Cir. 2003).

For 19 years out of the last four decades, Dr. Wecht has served as Coroner of Allegheny

County. For all of the last four decades, Dr. Wecht has also been a nationally and internationally

acclaimed forensic pathologist, one of the leading practitioners of the art of solving the mysteries

---

[1]     This motion addresses the first four warrants obtained in this case. Defendant reserves the right
to challenge additional warrants when and as appropriate.

of death.  That Dr. Wecht practiced his craft around the world is no more a secret to the people of Pittsburgh than that the Steelers play here.  His rendition of such services was not alleged to be "dishonest" by any of the prior and numerous esteemed United States Attorneys in this district who served coincident with Dr. Wecht's service—people like Dick Thornburgh, Blair Griffith, Robert Cindrich, Linda Kelly, Frederick Thieman or Harry Litman.

At age 75, Dr. Wecht now stands charged in the twilight of his career of rendering dishonest services to the citizens of Allegheny County, ironically because in fact he refused to render dishonest services to the county to keep political peace with the District Attorney of Allegheny County, Stephen Zappala ("Zappala").  The investigation into Dr. Wecht was prompted by Zappala's referral to the federal agents involved here for an improper purpose because, according to Zappala, Dr. Wecht was using his office of coroner for improper personal gain.

As will be demonstrated, Zappala's motivations were not only improper but pretextual and hypocritical as well.  Zappala was not motivated by any real concern that public office was being used for personal gain.  In fact, at exactly the same time Zappala was publicly complaining about Dr. Wecht's supposed misuse of his public office for private gain, he was quietly entering into a no-bid lucrative <u>renewal</u> contract with the law firm he left in 1998, over eight years ago, but which continues to pay him undisclosed amounts each year.[2]  Indeed, largely contemporaneous with his referral of Dr. Wecht to the federal authorities for allegedly misusing public office for private gain, Zappala entered into a "renewal" contract at an estimated cost to taxpayers of $200,000 with his old law firm, Brucker, Schneider and Porter ("Brucker"), which continues to pay him an undisclosed amount of money eight years after he left it, to provide

---

[2]    <u>See</u> Zappala Statement of Financial Interest for the years 2001-2004, filed at the Allegheny County Manager's Office.  Ex. A.

"solicitor" services to the District Attorney's office.[3][4]  The arrangement is roughly akin to Dr. Wecht, as coroner, entering into a contract with Cyril H. Wecht Pathology & Associates (hereinafter "Wecht Pathology") to be a consultant to the coroner, using public monies to fund, at least in part, his private source of income.  Dr. Wecht has never done so, is not accused of doing so, and the plain reality is that Zappala's actions are certainly closer to the type of situation rendered criminal by the dishonest services theory of mail fraud than <u>anything</u> Dr. Wecht stands accused of doing.  Indeed, on the theory used to prosecute Dr. Wecht, Zappala is <u>more</u> obviously guilty of dishonest services mail fraud than the party who now stands accused of it—Dr. Wecht.

The pretextual referral done for a clearly improper purpose was designed to, and did, stop an important public debate caused by Zappala's failure to prosecute select police officers in the face of Dr. Wecht's opinion that the citizen deaths at their hands were homicides.  And it worked.  As a result of the indictment, Dr. Wecht was obliged to resign as medical examiner—accomplishing the goal of Zappala.

For many years, prior to the "investigation" triggered by Zappala, Dr. Wecht rendered decisions regarding the cause and manner of death of residents of Allegheny County in his official capacity as coroner.  He did so not only for Allegheny County but for people all over the world who, unlike Zappala, sought and desired his expertise to help solve the mysteries of death.  Dr. Wecht also provided his expertise to district attorneys and coroners of surrounding counties who treasured his expertise when determining whether the forensic evidence proved a death by

---

[3]    <u>See</u> March 7, 2005 Executive Action 233-05, filed at the Allegheny County Manger's Office and referenced at www.county.allegheny.pa.us/exaction/mar2005/250307.pdf.  Exs. B and C.

[4]    This is not the first or only no-bid contract entered into by Zappala with Brucker during his tenure as district attorney.  While investigation is continuing, it is known that there is at least one other in 2002 which cost taxpayers $21,342.86, also at a time Zappala was being paid an undisclosed amount by Brucker.  <u>See</u> Executive Actions 678-02 dated April 24, 2002, and 704-02 dated May 3, 2002, at Exs. D and E.  <u>See also</u> Ex. F, referenced at www.county.allegheny.pa.us/exaction/may2002/220506.pdf.

homicide and, if so, in establishing the guilt of the murderer. Unlike his prosecutorial brethren in surrounding counties, Zappala preferred to make charging decisions in homicide cases, especially ones involving a policeman involved in a citizen's death, unburdened by Dr. Wecht's opinion as to whether or not a particular death was a homicide.

Zappala's distaste for Dr. Wecht's homicide determinations in such cases reached its zenith in the case of Charles Dixon ("Dixon"), a black man who went to a private birthday party at Mt. Oliver Fire Hall on December 21, 2002. Dixon's brother got into a spat with two police officers on duty at the premises because he had put his hands in a bowl of spaghetti in the serving line. Ex. G, p. 1. When Dixon attempted to intercede, the officers refused to permit Dixon to take charge of his brother. Id. at p. 2. The officers then tried to arrest Dixon for disorderly conduct and called in 13 additional officers for backup. The evidence gathered at a subsequent coroner's inquest from non-police witnesses indicated that the officers subdued Dixon by piling onto and lying on his back, much like one sees football players do when piling on the ball carrier. Id. at p. 3. Dixon was brain dead on arrival at the hospital after they did so. This was not the first time in recent past that a black citizen committing no crime was killed by white officers who had literally crushed the life out of a citizen. In October 1995, the same thing had happened in the well-publicized case of Johnny Gammage, who was killed by several municipal officers during a questionable traffic stop. Due to an ineffectual and half-hearted prosecution by Zappala, not one of those officers was ever convicted of anything, causing a well-known furor in the community.

After an autopsy on Dixon, the coroner's office opined on December 23, 2002 that the cause of death was positional and mechanical asphyxia and that the manner of death was homicide, essentially the same findings it had made in the Gammage case. Ex. H, pp. 1-2. Dr.

- 4 -

Wecht publicly urged Zappala to identify the officers who had piled onto Dixon and prosecute them. Ex. I. Zappala chose to do nothing and refused to prosecute.

On September 24, 2003, counsel for Dixon's estate, in a case pending in this Court, wrote to Dr. Wecht asking that he supply expert medical testimony regarding positional asphyxiation and for his opinion as to what happened to Dixon. Ex. J. On October 2, 2003, Dr. Wecht submitted an expert report in the case outlining for the parties involved, just as he had done previously for Zappala, the scientific and forensic evidence supporting the conclusions that Dixon had died as a result of asphyxiation. Ex. K. For his expert services, and as is routine and customary, Dr. Wecht was paid $5,000. Faced with the prospect of actually having their actions examined in a court of law, the parties involved settled the case. Rather than reflect on his decision not to prosecute, Zappala lashed out publicly at Dr. Wecht and vowed to have the federal authorities look into his activities. On February 12, 2005, Zappala was quoted in the newspaper as stating that Dr. Wecht should be prosecuted for violations of the State Ethics Act and, in a demonstration of how little he knew of federal criminal law, the federal Hobbs Act because, according to Zappala, Dr. Wecht was using his public office for personal gain, citing specifically that Dr. Wecht had been paid $5,000 to provide his expertise to the Dixon family in the Dixon civil case.[5] Ex. L. In exactly the same time period, in fact just two weeks later, Zappala, as district attorney, directed that a no-bid "renewal" contract be awarded to his old law firm from which he was paid monies. Exs. B and C, p. 2. On its face, the estimated annual cost

---

[5]    Dr. Wecht is expressly permitted by the Allegheny County Home Rule Charter to render such private service, notwithstanding the government's false suggestion to the contrary in the indictment. Indictment ¶ 8. Citing one part of the relevant provision, and deliberately omitting the rest of the section, the Government alleged that Dr. Wecht was required to work full time as coroner. Indictment ¶ 8. The full text of Section 5.601.01(B) of the Home Rule provision provides: "An independently elected official shall devote full time to the duties of the office. The official is not precluded from engaging in other compensated employment."

was not to exceed $50,000 per year and was both "retroactive" to January 1, 2004, and extended until the end of 2007, a period of four years.  One month later, Zappala filed his state ethics form listing that firm as a "Direct or Indirect" source of income.  Ex. M.  This sequence of events is the unquestioned genesis of the investigation into Dr. Wecht.

No complaint by a citizen for whom Dr. Wecht served as coroner triggered this investigation.  Not one private client to whom Dr. Wecht had ever rendered his expertise complained about him in any way.  No district attorneys from other counties complained about his services—then or now.  Indeed, since federal prosecutors in the Western District of Pennsylvania have charged Dr. Wecht with defrauding those state prosecutors, the reality is that they have continued to consult with Dr. Wecht.

Following this highly politically-motivated investigation commenced on pretextual reasons, the ensuing investigation into Dr. Wecht was, by definition, of the "let's find something" genre.  It is a classic case of exactly the type of "misuse" of the mail fraud statute condemned in this and other circuits and, as such, raises troublesome issues regarding selective and vindictive prosecution, as well as statutory and constitutional issues which this Court will have to address.[6]  The means and methods of such government misuse thereafter are a textbook example of what can happen when government agents ignore controlling law and conduct investigations without regard to clear limiting principles on honest services cases and simply toss aside the Fourth Amendment when seeking the powers of search and seizure in what is clearly a fishing expedition.  The evidence outlined below, and which will be developed more fully at a hearing, establishes that:

---

[6]    Counsel for Dr. Wecht is preparing these additional motions to present to the Court as soon as completed.

1)   United States Magistrate Judge Amy R. Hay issued the search warrants in question solely on the affidavits of FBI Agent Bradley Orsini, a Government agent with a known bad reputation within the FBI, including having urged witnesses to perjure themselves in a case involving his own misconduct.[7]  Orsini's affidavits were deliberately and recklessly false in material respects.[8]

2)   The warrants in question were based solely on affidavits of Orsini and are so lacking in indicia of probable cause and infected with his deliberate and reckless falsehoods as to render any belief in existence of probable cause entirely unreasonable.

3)   The warrants in question are facially defective and repeatedly and consistently failed to adequately particularize the place to be searched or the things to be seized.[9]

4)   Orsini used the warrants in question as if the warrants were general rights of search and seizure, which was his plan all along.

## II.  FACTS

1.   Following Zappala's referral in February, less than two months later, Orsini devised a plan to obtain search and seizure powers—all of which required him to demonstrate

---

[7]   Counsel for Dr. Wecht represents, by way of proffer, that they have repeatedly interviewed a witness with personal knowledge of Orsini's reputation and tactics and who was personally asked by him to lie during a Department of Justice investigation into his misconduct.  The witness has further represented that a subpoena will be honored for a suppression hearing.

[8]   Orsini's affidavit seeking permission to seize Eileen Young's laptop computer is Exhibit N.  His affidavit for the desktop computer of Kathy McCabe is Exhibit O.  His affidavit for "approximately twenty" boxes at Wecht Pathology is Exhibit P.

[9]   The warrant for the laptop computer used by Eileen Young is Exhibit Q.  The warrant for the desktop computer of Kathy McCabe is Exhibit R.  The warrant for "approximately twenty" boxes is Exhibit S.

probable cause to a neutral magistrate.  Thus, on April 7, 2005, Orsini applied for three search warrants to Magistrate Judge Hay.  Those warrants were the initial search warrants in the case.

2.      The only "evidence" submitted in support of all three applications was Orsini's affidavits.  No other evidence was presented in regards to the three requested warrants other than Orsini's affidavits.

3.      Orsini was transferred to the FBI's Pittsburgh office after doing the Government's version of penance—specifically following a geographical change in his assignment after he was involved in improprieties in the FBI's Newark office during which he requested at least one witness to commit perjury.  After doing his penance, Orsini was eventually transferred to the FBI's Pittsburgh office in or around February 2005 to work on "Public Corruption."

4.      At all times prior to his transfer to Pittsburgh, Orsini's reputation and misdeeds were known to the FBI's Office of Professional Responsibility, which is to rid the department of problematical agents.

5.      By his affidavits, Orsini sought the magistrate's approval to seize a desktop computer used by Kathy McCabe, Dr. Wecht's secretary at the coroner's office, a laptop of Eileen Young, another of his secretaries, and, in the words of the ensuing warrant, "approximately twenty" boxes of Dr. Wecht's private files supposedly maintained at a specific location within the offices of Wecht Pathology.

6.      In all three affidavits, Orsini spun an incredible yarn for both the assertion of federal investigatory jurisdiction and the factual basis for requesting that the extraordinary power of search and seizure be vested in him.

7.      The stated jurisdictional basis for federal investigatory power was that Orsini was investigating whether Dr. Wecht had committed honest services mail fraud and alleged

violations of 18 U.S.C. § 666, a federal statute specifically designed to cover public officials who steal money or engage in acts which the Third Circuit has termed "classic" theft. <u>United States v. Zwick</u>, 199 F.3d 672, 683 (3d Cir. 1999). Orsini's probable cause theory was <u>solely</u> that Dr. Wecht had allegedly violated his duty of honest services to the citizens of Allegheny County either by providing his services to others or because county employees did various things assisting Dr. Wecht in doing so, like having faxes sent from that office or, as he specifically stated in his affidavit, having <u>Eileen Young typing the expert report of Dr. Wecht in the Dixon case on a computer of Allegheny County</u>. Ex. N, ¶ 15; Ex. O, ¶ 15; and Ex. P, ¶ 15.

8.     The theory of honest services fraud outlined in all of Orsini's affidavits failed entirely to demonstrate probable cause to allege honest services fraud under then and now existing law established by the United States Court of Appeals for this circuit in <u>United States v. Panarella</u>, 277 F.3d 678 (3d Cir. 2002) and <u>United States v. Murphy</u>, 323 F.3d 102 (3d Cir. 2003). Indeed, the Government's failure to consider the requirements for a charge of honest services fraud established by the Third Circuit demonstrably continued up to the time Dr. Wecht was indicted for honest services fraud.

9.     In fact, on January 20, 2006, after indicting Dr. Wecht, the Government filed a document it styled "Indictment Memorandum" containing the legal authority relied upon by the Government to support the theory of honest services fraud being advanced for the first time in this district against Dr. Wecht. Nowhere in the document does the Government list the controlling authority in this circuit, <u>Panarella</u> and <u>Murphy</u>, as authorizing this type of prosecution nor even indicate awareness of those controlling authorities in this circuit for what constitutes honest services fraud. More problematically, not one of the cases cited by the Government in its

Indictment Memorandum holds that honest services fraud covers the type of conduct this prosecution now seeks to denounce as an offense to federal criminal law.

10.     In fact, the <u>only</u> honest services case cite provided by the Government was <u>United States v. Asher</u>, 854 F.2d 1483 (3d Cir. 1988), the bribery case which ended with former Pennsylvania State Treasurer Budd Dwyer's well-publicized public suicide.  Bribery is the classic and well-recognized example of honest services fraud.  <u>Panarella</u>, 277 F.3d at 690.  None of the cases cited by the Government deal with the other, but less well recognized, branch of honest services law regarding the types of conflict of interest situations which are subject to the mail fraud statute—all as laid out in <u>Panarella</u> and <u>Murphy</u>.

11.     Proceeding in violation of law since Orsini had no probable cause for anything under controlling law, Orsini nevertheless created a fanciful yarn designed to get judicial approval for warrants authorizing him to kick over the rocks in Dr. Wecht's life to see what he could find and to then proceed with a general search without ever disclosing that he did so or what he found doing so.  As will be demonstrated, whether by design or accident, Magistrate Judge Hay did <u>not</u> give Orsini "kick-over-the-rocks" warrants, and it should not be presumed that Magistrate Judge Hay would intentionally execute a general search warrant forbidden by the Fourth Amendment.

12.     A central anchor of Orsini's yarn, and one which is both fanciful and false on its face, was that Dr. Wecht was somehow furtively concealing that he did private work for others in addition to discharging his duties as coroner.  Ex. N, ¶¶ 5, 19 and 21; Ex. O, ¶¶ 5, 19 and 21; and Ex. P, ¶¶ 5, 19 and 21.  Indeed, and as stated, Dr. Wecht has been openly doing so for decades, and the genesis of Zappala's referral was Dr. Wecht's open and obvious work as a retained expert in the Dixon case.  To further such a false assertion that Dr. Wecht was concealing that he

did private work for other people in addition to his duties as Allegheny County Coroner, Orsini

cited Dr. Wecht's failure to "timely" file what Orsini characterized as "annual financial

disclosure forms" required by Pennsylvania state law.[10] Ex. N, ¶ 23; Ex. O, ¶ 23; and Ex. P, ¶

23. No other evidence is set forth in Orsini's affidavits attempting to establish concealment by

Dr. Wecht of the existence of his private work for others. As established by Panarella, however,

a threshold requirement of an honest services fraud case is that the Government must show

nondisclosure of an actual conflicting interest. Panarella, 277 F.3d at 695.

13.     Orsini went further in his attempts to suggest, falsely, that Dr. Wecht's failure to

"timely" file the forms required by state law evidenced concealment of his work for other people.

Thus, Orsini further advised the magistrate of Dr. Wecht's late filing of the forms as follows:

> "These forms, however, still do not disclose the substantial
> financial benefit WECHT has illegally obtained for his business
> and personal interests through his abuses of the ACCO's
> resources." (emphasis added) Ex. N, ¶ 23; Ex. O, ¶ 23; and Ex. P, ¶
> 23.

14.     Orsini's statements about alleged concealment by Dr. Wecht of his work for

others in addition to the citizens of Allegheny County were deliberately false, known to be false

when made; and deliberately supported by misleading, false and incomplete statements. Orsini's

suggestion that Dr. Wecht was "still" noncompliant with disclosure laws was equally false and

deliberately misleading.

15.     Dr. Wecht's work for others was well known and has been for decades. He has

been on national television discussing his cases; written extensively about such cases; and his

doing so has been a source of civic pride for decades going back to his work as a young man on

---

[10]     Orsini's affidavit nowhere discloses what years were supposedly "untimely" filed. The ensuing indictment only alleges untimely filings for the years of 2001-2004. Indictment ¶¶ 14 and 15. Nowhere does Orsini state that Dr. Wecht ever made a false filing or failed to disclose his private business in any filing ever made by Dr. Wecht.

the Kennedy assassination, and the citizens of Allegheny County have elected him as coroner overwhelmingly every time he ran.  And, insofar as the state disclosure forms relied upon solely by Orsini to try to show concealment of that otherwise open and notorious fact, Dr. Wecht disclosed the existence and his relationship to Wecht Pathology as far back as March 7, 1995, when he first ran for coroner, and has continued to disclose that relationship in every filing since then.  Ex. T.  Indeed, the suggestion of concealment is further belied by the Government's own indictment, which inconsistently alleges the known fact that <u>for years</u> Dr. Wecht also assisted the district attorneys and coroners of surrounding counties with his expertise, including homicide cases of great importance to the public.  Indictment ¶ 23 (a)-(c).

16.    Orsini knew that Dr. Wecht had disclosed the existence of Wecht Pathology in the same state forms relied upon by Orsini in prior years, and he deliberately did not disclose that and other information negating his only theory of the required concealment of an alleged conflicting interest.  Knowing that Dr. Wecht long ago disclosed the name of his private business work in state forms, Orsini nevertheless falsely suggested to the magistrate judge that he had not done so.

17.    Orsini's statement that Dr. Wecht had "still not disclosed the substantial financial benefit" he derived from his private work by his late filings in certain years further implies that Dr. Wecht remained non-compliant with state law so as to continue to conceal aspects of his private work.

18.    As Orsini well knew, the state law form Dr. Wecht was required to file, did not, and does not, require <u>any</u> public official to disclose their income from private business to the public.  Ex. U; <u>see also</u> 65 P.S. § 1105.

19.     For comparison purposes, attached hereto are Exhibits V and A, which are respectively the forms filed by Dr. Wecht and District Attorney Zappala for 2001 through 2004. Both demonstrate income and business relationships other than their official office.  Neither discloses the amounts made from such interests because neither the state disclosure law nor the form requires it.

20.     Long ago, Dr. Wecht publicly disclosed the amount of money he made through his private business in connection with the race for Chief County Executive.  In May of 1999, Dr. Wecht disclosed publicly that in 1998 he made $600,000 from his private firm and $51,925 as coroner.  Ex. W.  That Dr. Wecht should make a lot of money in his private business should come, and did come, as a surprise to nobody.  He is one of the best at what he does and has an incredible work ethic.  The statement of Orsini, and the innuendo of it, that Dr. Wecht had hid from the people of Allegheny County that he made substantial amounts in his private business is indisputably also false.

21.     The remainder of Orsini's three affidavits, which are virtually verbatim repetitions of each other, consist entirely of his account of what unnamed hearsay declarants and unnamed "confidential sources" supposedly told him.  In order to conceal Zappala's connection to the initiation of the investigation, Zappala's name was not listed anywhere as a source. Evidently, Zappala and Orsini agreed that Zappala would be treated as a "confidential source" while Orsini did his bidding.  In fact, although Orsini's affidavit cites "confidential sources" for the information he set forth in his affidavits, he never links any specific information provided to him by any confidential source and in particular did not do so with respect to a key allegation that mirrored Zappala's "reason" for the referral—that the expert report in the Dixon case had been typed on a county computer.  Ex. N, ¶ 15; Ex. O, ¶ 15; and Ex. P, ¶ 15.

22.     The fair inference from Orsini's affidavit is that most of the hearsay tales told by him were from present or former employees of the coroner's office.

23.     On the basis of information supplied him from unnamed hearsay declarants, Orsini, in his affidavit, proceeded to try to justify seizing the two computers used by Dr. Wecht's secretaries and "approximately twenty" boxes of Dr. Wecht's historical archives of his extensive outside consultations on various cases of national and local interest through the years.

24.     With respect to the laptop computer used by Dr. Wecht's secretary, Eileen Young, Orsini alleged that she did "private work for the financial benefit of WECHT to the exclusion of work on behalf of ACCO."  Ex. N, ¶ 15; Ex. O, ¶ 15; and Ex. P, ¶ 15.  Orsini cited precisely one, and only one, specific instance of Ms. Young supposedly doing so, and in the process gave away the improper reason for the initiation of the investigation and Zappala's role in it.  Specifically, the only evidence said to be on the computer was that Ms. Young had typed the report on it which Dr. Wecht provided to the family of Dixon in "the Charles Dixon case."  Id.  That suggestion almost certainly had to come from his "confidential source"—Zappala.

25.     The reference to the Dixon case is, however, a remarkable, albeit disguised, admission of the relationship of this investigation to Zappala's desire to silence Dr. Wecht from rendering scientific opinions in cases of police misconduct causing citizen homicides which Zappala would prefer to ignore unburdened by Dr. Wecht's application of forensic science to the case.

26.     Citing one source, the only other statement made by Orsini regarding the laptop of Ms. Young was that she "performs her private work for WECHT on a . . . computer . . ."  Ex. N, ¶ 16; Ex. O, ¶ 16; and Ex. P, ¶ 16.

27.     Aside from the isolated references to the Dixon report prepared by Dr. Wecht allegedly being on that computer, Orsini did not mention any other evidence of crime allegedly involving that computer.  As a matter of law, Orsini's basis for believing probable cause existed on the basis of such non-remarkable facts is woefully inadequate.

28.     Orsini's specific allegations justifying seizure of the desktop computer at the coroner's office were even more sparse and lacking in probable cause.  Citing one source almost certainly Dr. Wecht's secretary, Kathy McCabe, Orsini stated that "ACCO 16" had described to him how she used her desktop computer "to prepare thank you notes for ACCO staff and others, including [two deputies] . . . for their work at the seminars that financially benefited WECHT, and to prepare envelopes for mailings in furtherance of the seminars that financially benefited WECHT."  Ex. N, ¶ 13; Ex. O, ¶ 13; and Ex. P, ¶ 13.  Orsini made no further statements establishing probable cause to believe that this computer contained evidence of honest services fraud within the meaning of the mail fraud statute or theft within the meaning of 18 U.S.C. § 666.  Envelopes to seminar invitations and to prepare courteous thank you notes to two employees for their help were his only evidence.

29.     No federal criminal statute prohibits the use of state owned computers to type thank you notes.

30.     No federal criminal statute prohibits the use of state owned computers to prepare envelopes for educational seminars.

31.     No formulation of honest services fraud renders doing such acts to be subject to the federal mail fraud statute.  Such actions are clearly not the type of conduct within the mail fraud statute under Panarella and Murphy—the controlling legal authority at the time.

32.     Such information also does not establish probable cause to believe that 18 U.S.C. § 666, the only other federal statute cited by Orsini as being violated, is implicated either.  Under controlling legal authority also ignored by the Government established in United States v. Zwick, 199 F.3d 672 (3d Cir. 1999), § 666 is limited solely to "significant" acts of "theft or bribery in a classic sense." Id. at 683.

33.     No reasonable person would believe typing thank you notes and envelopes for seminar invitations involved classic theft, was significant, or was akin to stealing five thousand dollars of public monies.  Contrary to Orsini's affidavit, the seminar did not financially benefit Dr. Wecht.  The seminars were conducted by the Duquesne University School of Law Institute for Forensic Science & Law and were altruistic educational endeavors for which Dr. Wecht was not paid a penny.

34.     Orsini did not stop at the computers.  On largely the basis of the same information, Orsini sought permission to seize "approximately twenty" boxes of Dr. Wecht's private autopsy files located at the place of business of Wecht Pathology.  Citing an unnamed source, Orsini represented that "[t]he boxes are labeled on the outside with computer printed labels identifying the names of the decedents" as the ones he was looking for. Ex. N, ¶ 20; Ex. O, ¶ 20; and Ex. P, ¶ 20.

35.     The only reason given by Orsini to seize these boxes was the wholly unremarkable proposition that the boxes "reflect[ed] private autopsy work for the financial benefit of WECHT", and that these boxes had allegedly been moved from the coroner's office to Dr. Wecht's private office in early February 2005 after his "criminal probe . . . became public." Ex. N, ¶¶ 19 and 20; Ex. O, ¶¶ 19 and 20; and Ex. P, ¶¶ 19 and 20.

36.     As it relates to his desire to seize "boxes" of Dr. Wecht's private autopsy materials from his business premises, the identifying information for <u>which</u> specific boxes he sought were that they had computer printed labels on the outside of them and were in "a records room on the right-hand side of the office suite's hallway." Ex. N, ¶ 19; Ex. O, ¶ 19; and Ex. P, ¶ 19. Those were the boxes supposedly moved from the coroner's office.

37.     Nowhere in Orsini's affidavit does he establish, or attempt to establish, probable cause to rummage through the office generally to look for boxes. Nowhere does he identify any specific file he is searching for. Nowhere does he identify any specific files he intended to search or the probable cause for doing so.

38.     Insofar as the two computers were concerned, Orsini's affidavits relating to the seizure plan for both contained identical language. First, he stated agents planned "to seize those components of the computer system that [the Government] believes must be seized to permit the agents to <u>locate the items described in the warrant</u> at <u>an off-site location</u>." Ex. N, ¶ 28 and Ex. O, ¶ 28. The warrants do not, however, describe any specific items to be located at an offsite location.

39.     Recognizing that the computers he wanted to seize would contain information which could not be relevant to any legitimate investigation, Orsini represented that "[i]f so requested, [the Government] will . . . attempt to provide copies at a later time of any files <u>not within the scope of the warrant</u> that may be necessary or important to the continuing function of legitimate business by the subjects." Ex. N, ¶ 28 and Ex. O, ¶ 28. Nowhere does Orsini's affidavits identify what files were "not within the scope of the warrant." Likewise, the warrants do not identify what files were in the scope, or outside the scope, of the warrants.

40.     Recognizing that he had to obtain judicial approval to actually search the two computers after seizure, Orsini stated in verbatim language in the two affidavits to establish probable cause to seize the computers as follows:

> "As to inspection of the contents of the computerized storage areas for seizure of files which are authorized to be seized . . . I am requesting that the agents be authorized to analyze all of the electronically stored data using any of the following techniques: (a) surveying various file 'directories' and individual files they contain in order to locate evidence and instrumentalities authorized for seizure by the warrant; (b) 'opening' or reading the first few 'pages' of such files in order to determine their precise contents; (c) 'scanning' storage area to discover and possibly recover recently deleted data and scanning storage areas for deliberately hidden files; and (d) performing electronic 'keyword' searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation." (emphasis added)  Ex. N, ¶ 31 and Ex. O, ¶ 31.

41.     All three affidavits filed by Orsini were placed under seal at the time and not available to the public or Dr. Wecht, which further operated to conceal Orsini's then-existing plans.  Dr. Wecht did not know, and could not have known, of the falsehoods and contents of Orsini's affidavits until those affidavits were provided to counsel after indictment.

### III.   THE ISSUANCE OF THE WARRANTS

42.     Magistrate Judge Hay issued three warrants in response to Orsini's affidavits on April 7, 2005.  None of the warrants referred to or incorporated Orsini's affidavits, which were sealed and not served with the warrants.  The warrants issued were:

(1)     Warrant at 3:10 p.m. – This warrant authorized Orsini to search the personal premises of Eileen Young for the "property specified" and to "seize same."  The property to be seized per the face of the warrant stated only "See Attachment 'B'."  Below boldface type stating "ATTACHMENT 'B' – PROPERTY TO BE SEIZED", the warrant

stated: "A laptop computer manufactured by Dell, and all information and data contained therein, including data stored on any associated data storage devices such as zip drives, discs (of any kind including cd and hard), and back-up tapes."[11]

(2)     Warrant at 3:12 p.m. – Exactly two minutes later, Magistrate Judge Hay signed a warrant authorizing a search of ACCO's place of business and again the seizure of items listed only on "Attachment 'B'." Once again, under the bold print legend about "Property to be Seized", it stated in relevant part: "[A] desktop computer maintained in the office of Kathy McCabe on the second floor of the ACCO and all information and data contained therein, including data stored on any associated data storage devices such as zip drives, discs (of any kind including cd and hard), and back-up tapes." Ex. R.

(3)     Warrant at 3:18 p.m. – Six minutes after signing the second warrant, Magistrate Judge Hay signed a third warrant authorizing a search of the premises of Dr. Wecht's private business address, again for items on "Attachment 'B'", which stated: "Boxes (approximately twenty) and contents containing private autopsy files." Ex. S.

43.     Each warrant signed on April 7, 2005, commanded the Government to "prepare a written inventory of . . . [the] property seized . . .."

---

[11]     The warrant of 3:10 is attached as Exhibit Q. This computer was not at Eileen Young's house when agents attempted to execute the warrant. The next day, a fourth warrant was obtained on identical allegations to seize the computer if found at the coroner's office, which it was. Ex. X.

44.     Despite Orsini's specific request for authorization to seize and then search "all" of the electronically stored data on the computers in the manner he requested in his affidavits, Magistrate Judge Hay provided no such authority in the actual warrants.  The warrants contain no language authorizing any search whatsoever of either computer's contents, let alone "all" the content.  The warrants contain no language granting Orsini's request or language adopting and authorizing Orsini's proposed protocol as the search criteria to be employed to search "all" of the computers' data, which if it had been granted would have been an invalid general search warrant and the abdication of the judicial officer's responsibility to delineate the permitted search in the warrant in favor of letting a government agent determine the parameters of a search.

45.     Similarly, the warrant authorizing the seizure of "boxes (approximately twenty) and contents containing private autopsy files", a description which grossly fails to describe with particularity _which_ boxes are authorized to be seized from Dr. Wecht's private office, does _not_ contain any language authorizing a subsequent search of the contents of the boxes or describe any limitation or scope to any such search.

46.     In format and language, all three warrants issued on April 7, 2005, effectively authorized only a seizure of the two computers and 20 "boxes", and no more.  In fact, all three used an Attachment B to define the purpose of the warrants.  As noted, each one was actually headlined as "Attachment 'B' – Property to be Seized."  Exs. Q, R and S.

47.     None of the warrants authorized _any_ of Orsini's subsequent actions.

48.     None of the warrants issued on April 7, 2005, identified the scope of the investigation or the specific federal crimes allegedly being investigated.

49.     None of the warrants established probable cause to believe the crimes being investigated had occurred or that the items being seized contained evidence of such federal crimes being committed.

50.     Aside from the lack of probable cause to allege that Dr. Wecht had concealed the existence of Wecht Pathology and his private autopsy work, a <u>threshold</u> requirement under <u>Panarella</u>, Orsini's affidavits also completely fail to identify an actual conflict of interest between Dr. Wecht's rendition of cause and manner of death opinions as a privately retained forensic pathologist and his rendition of such opinions in his role as coroner, another critical requirement for an honest services case under <u>Panarella</u>.  That Dr. Wecht had opined first as coroner that the death of Dixon was a homicide and then also provided the same opinion when later retained as an expert by the family of Dixon does not create the requisite conflict of interest defined by <u>Panarella</u> simply because the district attorney politically did not wish to be burdened by such opinions.

51.     Orsini's affidavits also fail, as they must, to demonstrate any discretionary act by Dr. Wecht as coroner which capitalized on a supposed undisclosed conflict of interest—another requisite for a legitimate honest services investigation and charges established by <u>Panarella</u>.

## IV.   THE EXECUTION OF THE WARRANTS

52.     Armed with the three warrants, Orsini determined that he would be personally involved in the seizure of the computers and would assign other agents to go to Dr. Wecht's private place of business to seize the "approximately twenty" boxes.

### A.   Seizure of the "Boxes"

53.     To seize the "approximately twenty" boxes allegedly located in a specific place at Dr. Wecht's place of business, four FBI agents <u>and</u> a photographer were sent to do the heavy

lifting associated with carrying out 20 boxes of documents supposedly located in the records room on the right side of the hallway.  Ex. Y.

54.    Orsini, however, was not present when the warrant was executed by officers who did not have Orsini's probable cause affidavits since they were sealed and not part of the warrant they were executing.  Nothing on the face of the warrant contained the identifying information Orsini had used in his affidavit as to <u>which</u> boxes were to be seized—the labeled ones in the record room on the right of the hallway.

55.    Dr. Wecht's wife, Sigrid Wecht, Esq., arrived at the premises, which also houses her law office, shortly after the federal agents arrived.  Her affidavit regarding their actions is attached as Exhibit Z.

56.    There were approximately 60 boxes in the office that day.  The boxes were not labeled on the outside as Orsini had sworn to indicate which boxes would be seized, and there were not, therefore, twenty labeled boxes in the records room on the right side of the hallway, which is the only place Orsini had requested to search and which he had used to further identify the boxes to be seized.  Ex. Z, ¶¶ 4 and 6.

57.    Sigrid Wecht observed that the agents were not able to determine which boxes were described in the warrant and that they "cannot find these 20 boxes."  The agents actually asked her to direct them to the "boxes", to which Mrs. Wecht correctly stated she had no idea which 20 boxes the warrant was intended to refer.  Ex. Z, ¶ 4.

58.    Sigrid Wecht advised the agents that boxes generally were stored in several locations within the office.  Ex. Z, ¶ 4.

59.    Given their lack of knowledge as to what boxes they were to seize, Sigrid Wecht heard the agents discussing what might or might not be covered by the warrant and observed

them call Orsini on the phone but could not hear what Orsini told the agents.  Ex. Z, ¶ 4.  Given

what he had told Magistrate Judge Hay, his <u>only</u> advice should have been to take the boxes in the

records room on the right in the hallway with labels on the outside if there were any and no

others because he had not sought nor obtained a warrant for any others.

        60.    Orsini evidently did not do so.  Agents thereafter split into teams and went

throughout the premises, opened up boxes at will to see what was in them, and decided which

ones they would take from different locations on the premises.  Ex. Z, ¶ 6.

        61.    Having done so, they did not remove "approximately twenty" boxes from the

right hand side of the hallway containing labels on the outside, but instead helped themselves to

twenty nine boxes without labels after rifling through the boxes at various locations in Dr.

Wecht's office.  Ex. Z, ¶¶ 6 and 7.

        62.    The boxes and files taken that day evidenced a general search outlawed by the

Constitution and unauthorized by the warrant and could not have been done pursuant to a good

faith belief that they contained evidence of federal crimes in this district.

        63.    Thus, according to the inventory subsequently filed (Ex. AA), federal agents

seized that day Dr. Wecht's files on various high profile matters he has worked on, including:

- files on Vincent Foster, President Clinton's advisor found dead during the
  Whitewater scandal  (Ex. AA, Box 7);

- files on Mary Jo Kopechne, who drowned after an incident with Senator
  Kennedy  (Ex. AA, Box 7);

- files on Kurt Cobain, a fabled rock artist  (Ex. AA, Box 7);

- files on Marilyn Monroe, a fable generally  (Ex. AA, Box 7);

- files on the Menendez case, the two brothers who killed their parents (Ex. AA, Box 8);

- files on James Earl Ray, the assassin of Martin Luther King (Ex. AA, Box 9);

- files on Jayson Williams, the pro basketball player who shot a person at his residence  (Ex. AA, Box 21);

- folders on the death of Elvis Presley  (Ex. AA, Box 29); and

- a folder on Tammy Wynette  (Ex. AA, Box 29).

64.    No investigative agent acting in good faith could possibly believe these files were relevant to the investigation outlined in Orsini's affidavit, and no probable cause was even attempted to demonstrate a basis to seize such files.

### B.  The Computers

65.    During the same time agents were generally searching the premises of Dr. Wecht's office, Orsini and other agents of the Government conducted general searches of the contents of the computers with no judicial permission or supervision.

66.    Orsini, however, did not disclose that he had done so.  In his official inventory filed with the Court after seizing the computers, Orsini listed only the computers themselves as having been seized.  Exs. BB and CC.  He did not identify any file or document on those computers which he looked at, or intended to look at, on the inventory filed with the Court and did not file any amended inventory at any time disclosing the files and documents he actually obtained as a result of searching the computer contents.

67.    To this date, the Government has not disclosed to any court or to Dr. Wecht the dates of any search of the computers; the person who conducted the search; the protocols used;

or any information that the search was even conducted in the manner for which Orsini sought but did not receive permission.

68.    Information derived as a result of the illegal and unauthorized search of the contents of the computers and "boxes" was used to obtain subsequent search warrants by agents working in connection with Orsini, and was used to make charges against Dr. Wecht having nothing to do with the subject matter of their supposed investigation being conducted by Orsini outlined in his affidavits including, but not limited to, trivial charges that Dr. Wecht had allegedly defrauded some private clients by charging them $80 for a limousine to the airport.

69.    Government agents made further and illegal uses of the information derived from the illegal searches.  Government agents not only ignored applicable privileges available to expert consultants such as Dr. Wecht in conducting their general and unauthorized search, they thereafter wrote letters to his private clients disclosing that he was under investigation by the Government under pretextual letters requesting that his private clients turn over their files to the Government.

70.    As a result of the foregoing action, Dr. Wecht is entitled to have all evidence obtained by the Government as a result of its illegal searches, as well as the fruit of those searches, suppressed from evidence available to the prosecution in this matter.

WHEREFORE, Dr. Wecht respectfully requests that the Court grant the following relief:

1)    An evidentiary hearing on this motion, with compulsory process authorized by the Court;

2)    Suppression of all evidence derived by the Government in its search of the computers and "boxes."

3)      Suppression of all evidence derived from evidence illegally obtained by the Government.

4)      Dismissal of all counts of the Indictment based upon or derived from illegally obtained evidence.

5)      Such other relief as is appropriate and just.

Respectfully submitted,


S/Jerry S. McDevitt, Esquire
Pa. I.D. No. 33214

Richard L. Thornburgh (Pa. I.D. No. 01048)
Mark A. Rush (Pa. I.D. No. 49661)
KIRKPATRICK & LOCKHART NICHOLSON
  GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222-2312
(412) 355-6500 – Telephone
(412) 355-6501 – Facsimile

Dated:  April 7, 2006                     Attorneys for Cyril H. Wecht

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of April, 2006, a true and correct copy of the within

MOTION FOR A SUPPRESSION HEARING AND TO SUPPRESS ALL EVIDENCE

GAINED BY THE GOVERNMENT AS A RESULT OF ILLEGAL SEARCHES was served by

electronic filing upon:

> Stephen S. Stallings, Esquire
> Assistant United States Attorney
> United States Attorney's Office Western District of Pennsylvania
> U.S. Post Office & Courthouse
> 700 Grant Street
> Suite 400
> Pittsburgh, PA 15219

> S/Jerry S. McDevitt, Esquire
> Jerry S. McDevitt, Esquire